## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **MAG. NO. 20-137 (DAR)** |
| | : | |
| **CODY TURNER,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that the defendant be detained pending trial pursuant to 18 U.S.C. § 3142 (f)(1)(A), 18 U.S.C. § 3142 (f)(1)(E) and 18 U.S.C. § 3142(f)(2)(A) of the federal bail statute.   The government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

### I.  Procedural History

The defendant is charged by criminal complaint with one count of Arson, in violation of Title 18 U.S.C. § 844(i), and one count of Destruction Against Any Property of the United States, in violation of Title 18 U.S.C. § 1361.  The defendant's initial appearance was on August 13, 2020, and the government orally moved for detention pending trial pursuant to the above-referenced provisions of the federal bail statute.

### II.  Legal Authority and Argument

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted.  Id.; United

States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996).   Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."   United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986); United States v. Williams, 798 F. Supp. 34, 36 (D.D.C. 1992).   A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery.   Smith, 79 F.3d at 1210, see also Williams, 798 F. Supp. at 36.

There are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.   *See* 18 U.S.C. § 3142(g).   A review and understanding of the facts and circumstances in this case require the Court to conclude that there is no condition or combination of conditions that would assure the safety of the community or the appearance of the person as required. *See* 18 U.S.C. § 3142(e)(1).

A.   **Nature and Circumstances of the Offenses Charged**

On July 15, 2020, at approximately 1:22 p.m., defendant Cody Tarner was observed on United States Supreme Court Police security camera footage driving his Blue/Gray 2009 Hyundai Sonata, 4 door, bearing MD tags registered to defendant Tarner (sometimes referred to as the "target vehicle") onto the Supreme Court's property located at One First Street, Northeast, Washington DC, and parking the target vehicle in an employee-only parking spot. Tarner was then observed walking around the Supreme Court and U.S. Capitol properties for several minutes before

returning to the target vehicle and pulling out what appeared to be a red gas canister. At approximately 1:48 PM, Cody Tarner was observed on security camera footage pouring an unknown liquid, later determined to be gasoline, onto three unmarked Supreme Court Police vehicles parked in Supreme Court employee only parking spaces. While pouring the gasoline on the vehicles, it was observed that some of the gasoline was splashing onto Tarner's person and clothing.  All the unmarked vehicles had emergency police lights visible from the outside of the vehicles, and one of the vehicles had emergency police lights on the roof of the vehicle.  Tarner was then observed lighting one of the vehicles on fire resulting in a violent ignition of the gasoline. This action resulted in Tarner being engulfed in the fire causing severe burns and injuries to himself. Medical staff later reported that he suffered burns to approximately 40% of his body.

Officer Grable, an officer with the Supreme Court Police Department, was on the First Street sidewalk of the Supreme Court on a fixed security post where she observed smoke and flames and heard a large explosion near the intersection of First Street and Maryland Avenue, Northeast. Officer Grable observed Tarner walking away from the explosion with burns and smoke coming from his clothing. Officer Grable called for assistance and started administering first aid to Tarner.  While Tarner was committing the acts of arson and destruction of property at the Supreme Court of the United States, Tarner was observed by Supreme Court Police security camera footage with a bandana covering part of his face.  After the incident, the bandana was located in close proximity to Tarner.

Law enforcement officers watched and reviewed the described security camera footage of the incident and confirmed that the individual who committed the arson and destruction of property was the person Officer Grable interacted with and to whom Officer Grable administered first aid.

The individual that committed the arson and destruction of property was identified at the scene by another Officer of the Supreme Court Police as Cody Tarner through his Maryland driver's license and Military Identification Card that were located next to Cody Tarner along with other possessions.   It is noted that Cody Tarner's pants pockets appeared to have burned off from the fire. The individual who committed the arson and destruction of property also identified himself to medical personnel as Cody Tarner.   Law enforcement officers also reviewed a photograph taken by U.S. Capitol Police of an individual U.S. Capitol Police identified as Cody Tarner during a prior law enforcement interaction. According to law enforcement officers, including Officer Grable, the individual in that photograph is the same individual observed on security camera footage committing the arson and destruction of property and the person with whom Officer Grable interacted and to whom Officer Grable administered first aid.

During post arrest interviews, Tarner admitted that he was the person that intentionally started the fire with 87 octane unleaded gasoline he had purchased in Pennsylvania for that purpose.

The fire that defendant Tarner ignited after pouring the gasoline accelerant on the three vehicles caused one of the vehicles to be completely engulfed in flames and a second vehicle to also sustain fire damage. A red fuel canister was observed on the ground next to the burning vehicles.

The two damaged vehicles, a 2016 Ford Interceptor and a 2017 Ford Expedition, are both owned by the Federal Government, specifically the U.S. Supreme Court Police Department. The Ford Interceptor was manufactured at a plant in Chicago, Illinois.   The Ford Expedition was manufactured in Jefferson County, Kentucky.   The third vehicle, a 2012 Ford Econoline was not

damaged and is also owned by the Federal Government, specifically the U.S. Supreme Court Police Department.   The Econoline was manufactured at a plant in Avon Lake, Ohio.   Therefore, the three police vehicles traveled in interstate and/or foreign commerce prior to being used by the U.S. Supreme Court Police Department in Washington, D.C.

The U.S. Supreme Court Police Department conducts business in interstate commerce, for instance by purchasing vehicles and other equipment and supplies, including the vehicles at issue here, in interstate commerce.   In doing so, the vehicles are used in and affect interstate commerce, including by crossing state lines to provide protection details for the Justices and for other official business of the U.S. Supreme Court Police Department.   The activities of the U.S. Supreme Court Police Department in enforcing laws and providing protection, including with the use of the vehicles, also affect interstate commerce.

Both the Ford Interceptor and the Ford Expedition sustained damage, with the Ford Interceptor that was engulfed in flames appearing to be a total loss, resulting in damages in excess of $1,000.

Units from the D.C. Fire Department responded to the U.S. Supreme Court to extinguish the fire that resulted from Tarner's acts of arson and destruction of property.   Because Tarner was observed in the target vehicle before he committed the arson, the target vehicle was deemed a suspicious and potentially dangerous vehicle.   The U.S. Capitol Police Bomb Squad believed that the target vehicle may contain additional explosives and accelerants and may pose a danger to law enforcement and emergency personnel at the scene.   Three U.S. Capitol Police explosives K-9 and an ATF accelerant K-9 had conducted a preliminary scan of the area and the target vehicle for explosives or accelerants. The ATF accelerant K-9 alerted to the target vehicle and to other

locations on the scene.   Defendant's cellular phone, a Black ZTE Blade Cellular Phone, MEID # 256691622506690917, with the phone number ending in 4094 (sometimes referred to as the "target phone"), was located on the right front passenger seat of the target vehicle.

The investigation has revealed that Tarner has had several encounters with law enforcement in which he has expressed what can be referred to as anti-government and militia extremist ideologies.   Tarner has claimed to be the leader of a particularly identified militia group. Tarner has told multiple local and federal law enforcement agencies that he was the leader of the group and has created an online Facebook group page named after the identified militia group. That Facebook page states in the group's biography that, "[The militia group] is a Stateless NGO That has bothTactical [sic] & Diplomatic Wings & Calls For The Destruction of The Ink Machine of the United States Government."   The "Impressum," or what is commonly known as the "about us" section of the Facebook group page, provides, "We Want to Kill you."   The contact information for the Facebook group's email address contains defendant Tarner's name, with the phone number to the target phone ending in 4094.

During a post-arrest interview, Tarner has confirmed that his current cellular phone is a ZTE phone.   Law enforcement has confirmed through a close relative of Tarner's that the phone possessed and utilized by Tarner is a cellular phone with the same phone number ending in 4094 and that Tarner utilizes the phone to make social media posts.   During law enforcement interviews since Tarner's arrest, Tarner has admitted that the target phone recovered from the target vehicle is the only phone he presently utilizes.   A law enforcement data base check made since the incident has revealed that Tarner's cell phone number ending in 4094 is Cody Tarner's cell phone number.

6

One police encounter with Tarner occurred on February 12, 2020.  Tarner was stopped by the U.S. Capitol Police on U.S. Capitol grounds, where he was observed taking photographs of official government vehicles and license plates used by U.S. Capitol Police in the protection of members of the United States Congress. During this incident, U.S. Capitol Police interviewed Tarner during which he conveyed pro-militia extremist ideologies with the stated objective of negotiating payment from the U.S. government. Tarner stated to officers that he was at the Capitol to "negotiate to stop a civil war." Additionally, Tarner told officers that he was at the Capitol to "negotiate to get 80 million dollars" so he would not have to fulfill and collect the bounty Iran placed on the President of the United States. Tarner stated that if he did not receive his payment he would "raid the town" and "hold the area" on Capitol Hill for an hour. Tarner told officers that he knew how to build a nuclear bomb and would do so if his payment was not received.

On February 19, 2020, U.S. Capitol Police contacted Tarner for a subsequent phone interview regarding his recent visit to the U.S. Capitol.  Tarner was contacted at the telephone number ending in 4094, the number of the target phone.

On February 21, 2020, Tarner posted on his Twitter profile a photo of police officers and stated, "Here's a Picture of some Yankees 12Feb20 looking Incompetent They opened a Federal Investigation into me Mixed Feelings about it, But I suppose it was appropriate for now on their end But I have to retaliate proportionally and make them uncomfortable in this give and take."

On April 17, 2020, law enforcement observed the following post on defendant's militia group's Facebook page:  "Move to MOPP LEVEL 4 Prepare for Mutiny Total Authority must be Challenged All Personnel to Report to Facilities 4 and 7 in The Green zone and make Immediate preparations Yankees have reached Unsurvivable rate and must be administered directly No

Bounty is worth Anarchy Let us take the entire portion unto ourselves instead Assume Protocol 2."

On April 23, 2020, Tarner went to the White House complex and told a United States Secret Service officer that he would like to jump the White House fence, but a few minutes later advised that he had no desire to jump the fence.   On April 24, 2020, the U.S. Secret Service observed several comments on Tarner's social media accounts regarding nuclear weapons and being denied "the bounty."   That same day, U.S. Secret Service officers again encountered Tarner at Lafayette Park across the White House. Tarner told the officers that the U.S. Secret Service should be worried about the world blowing up. Tarner initially told officers that he was going to set off a thermonuclear device, but later said he would not set off the device, and said "you are" when talking to the officers. Tarner stated that he would not set off the device, but hoped the government would set off the device because he wanted the world to blow up.

Tarner also told officers that he came to the area of the White House because he wanted to convince President Trump and the administration that humans were in danger. Tarner claimed to officers that he was the "Emperor of the Metro Area," and currently led his militia group. Tarner continued to explain that he was a nuclear engineer in the U.S. Navy, and was discharged because "they" did not agree with his views on educating others on how to manufacture Yellowcake, a reference to uranium concentrate powder.   A relative of the defendant has confirmed that the defendant has some kind of nuclear engineering background with the U.S. Navy.

Tarner also told the Secret Service officers that he had visited the U.S. Capitol and informed U.S. Capitol Police that he wanted to take over the Capitol and to set off a thermonuclear weapon in Washington, D.C. Tarner told the U.S. Secret Service that he wanted to set off the

explosion "to gain notoriety." He went on to say that he hated President Trump and wanted to convince him that "the most dangerous thing to humans is another human." Tarner claimed that he did not personally want to carry out his mission, but that the U.S. Secret Service "would do it themselves."

Later that evening on April 23, 2020, Tarner posted online, "Every Entrance is blocked and unrammable I'll find a signal maker on Foot Go on Gunshots" as well as, "It appears as long as I do not Jump fence they will allow me to remain Come to White House front door to End This Admin."

On April 27, 2020, Tarner posted online, "/32/ I KNOW THAT YOU HEAR ME /32/ The Fact That I am Talking to you RIGHT NOW Should Terrify you I've broken Every law Leaked Nuclear Top Secret Threatened your Capitol Hill On February 12 And Now your White House YET HERE I AM STILL."

On May 23, 2020, a friend of Cody Tarner reported to the Hagerstown, Maryland Police Department that Tarner was espousing violence and that Tarner hoped to terrorize the country with bombs and nuclear weapons.

In or about June or July 2020, another close acquaintance of Tarner reported to police that he believed Tarner was a user of methamphetamine.   A relative of Tarner has also stated to law enforcement that Tarner was a drug user.   Drug paraphernalia was recovered by law enforcement from the target vehicle.

On July 9, 2020, Tarner was stopped by the Allegheny Township Police Department in Pennsylvania. During the stop, Tarner stated that he knew how to make bombs and that he knew

the compounds of bomb making material.  The officer reported that Tarner had made vague threats during the stop.

The pretrial services report provides that Tarner suffers from schizophrenia.  As recently as August 12, 2020, law enforcement officers observed Tarner talking to himself and stating to himself "You better tell them."   At the same time, he was observed making violent punching and snatching motions as if he was arguing with a separate personality within himself.

**B.**      **Weight of the Evidence Against the Defendant**

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention.   The evidence against the defendant is very strong.   The defendant was captured on videotape with the container of gasoline, pouring the gasoline on the vehicles and igniting the fire that destroyed one police vehicle and damaged a second vehicle.   The defendant was immediately found at the scene suffering from burns caused by the fire he started, as captured on video.   The defendant was immediately apprehended by law enforcement and the remnants of his personal belongings were also recovered at the scene, including his license and military identification.   His target vehicle and target phone were also recovered at the scene.   Moreover, as reflected in the factual summary, above, the evidence of defendant's motives is also substantial.   The evidence also shows that at least two of the police vehicles at issue suffered extensive damage as a result of the defendant's actions, with one vehicle being a total loss.   Finally, the defendant has admitted during post-Miranda statements that he intentionally committed the arson and destruction of government property.

**C.**      **The Defendant's History and Characteristics**

The third factor, the history and characteristics of the person, similarly weigh in favor of

detention.   The defendant has strong animus toward the government and law enforcement and he has remained undeterred from committing violent acts as evidenced by his extensive planning and numerous contacts with law enforcement leading up to the crimes at issue.   He has extensively espoused a desire to commit violent acts, including with nuclear weapons.   The defendant has stated that he has a nuclear engineering background, which has been corroborated by one of his relatives.   The defendant also appears to have mental and substance abuse problems, further ingredients for a disaster.   Additionally, the defendant was able to commit the charged offenses on Capitol Hill, a place with overwhelming security, an indication that no place is safe from the defendant.   The defendant's apparent lack of criminal convictions is notable, but the instant alleged conduct represents an escalation from violence espousing rhetoric to very violent and destructive conduct. According to the Pretrial Services Agency report, the defendant is also homeless and jobless, and according to his own statements, the defendant was released by the military for misbehavior.   The defendant should not be released because he poses a danger to the community and is a risk of flight.

> **D.** **Danger to the Community**

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs in favor of detention.

The defendant's conduct in this case speaks to his danger to the community.   His extensive violence riddled rhetoric, planning and actions of igniting gasoline and destroying police vehicles on Capitol Hill speak to his disregard for law enforcement and for the safety of the community at large.   Notably, this behavior occurred after multiple contacts with police investigating his planning and his violence promoting proclamations.    For these reasons, the government submits

that the Court should order the defendant's detention during the pendency of this case to protect the community.

       E.      **COVID-19 Representations**

The government anticipates that the defendant may also request release because of the COVID-19 Coronavirus (COVID-19) that is currently affecting the nation. The government believes that the defendant may argue that the D.C. jail is ill-equipped to handle the pandemic. The U.S. Attorney's Office has been in consultation with the DOC in light of the rapidly-changing situation.

As set forth in more detail below, DOC is taking precautionary steps to address this problem, and any assertion that DOC is failing to take remedial action is without merit. Specifically, DOC has done the following to ensure the safety of its incarcerated population: (1) banned all non-attorney visits to limit unnecessary exposure; (2) implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.; (3) if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmate's only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days; (4) DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus; (5) DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.; (6) DOC has constant meetings with the D.C. Department of Health to ensure its procedures

meet both local and national standards, to include following updated recommendations of the CDC; (7) DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations; (8) DOC checks and rechecks its ventilation system to ensure the air quality in the facilities; (9) DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap), as well as protective gear; (10) DOC is working with MPD to limit the number of inmates coming into its facility at any given time; and (11) DOC has the capacity to quarantine approximately 100 inmates, if necessary. *See also* Coronavirus Prevention, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43 (explaining how DOC has suspended in-person visitations, enhanced cleaning efforts, ordered additional sanitation supplies, and diminished out-of-cell recreational time in response to the threat of COVID-19).

As of August 13, 2020, the government has been advised that there is only one person at the D.C. jail who is currently positive and is being handled consistent with CDC guidelines.[1]

The government has also reviewed and assessed the Court's memorandum opinion in *Banks v. Booth*, 20-cv-849-CKK (April 19, 2020) and the *Banks* Court's decision to grant the temporary restraining order in part does not change the government's position in the instant case. First, as should be clear from the Court's detailed, 31-page memorandum opinion, this is an early stage of ongoing and very active litigation. While the Court granted injunctive relief in the form of a detailed adoption of the *amici* recommendations (*see* Mem. Op., at 26-31), many of which were modifications of existing procedures, the Court did <u>not</u> release any prisoners, noting that the D.C. Superior Court has taken steps to reduce the prisoner population. *Id.* at 27. Moreover, the

---

[1] This number is likely to change as more tests are conducted.

Court specifically remarked that individual judges can assess individual inmates for release. *Id.* The Court further denied plaintiffs' request for an expert in prison population reduction. *Id.* Put simply, it is not appropriate to release any person at this juncture.

Rather, the Court ordered DOC to address deficiencies in its protocol and the application of said protocol and rectify those specific deficiencies. As the Court repeatedly stated, it expected that "additional development of the record may show that Defendants are taking sufficient precautions and that Defendants' response continues to evolve." Mem. Op., at 22. In other words, the case continues. The government has every expectation that DOC will comply with the Court order, and in the next few days and weeks, DOC's protocols will be implemented consistent with the Court's mandate.[2] The *Banks* Court will continue to monitor DOC compliance, and expects that a more fulsome record will be further developed.

All parties have an interest in ensuring the safety and security of inmates, regardless of the danger or flight risk they represent. And the Court's memorandum opinion takes this duty seriously. Assuming the *Banks* allegations are true, without an exhaustive evidentiary body produced by DOC, the *Banks* Court clearly anticipates change. Thus, the conditions at the jail will only get better. The government appreciates the unprecedented institutional challenge that DOC faces, and expects that DOC will comply with the Court order. The Bail Reform Act and the individualized factors should continue to guide the detention analysis. At this stage, given the current handling of the civil case as well as the record and proffer in this case, this Court should detain the defendant pending trial.

---

[2] As noted by the government's Response to the D.C. Defendants' Motion to Joint the United States as a Necessary Party, 20-cv-849 (ECF No. 46), the government does not operate or have authority over the D.C. Central Detention or Correctional Treatment Facility, and thus cannot address or alter inmates' conditions of confinement at those facilities.

There is nothing right now that suggests the defendant's particularized health necessitates his release.   Before the defendant was released from the hospital that was treating his injuries, the government was assured by treating physicians that the defendant's injuries would not be affected or irritated by a jail setting.

The defendant stands accused of two very serious felony offenses, which show clear danger to the community at large. The defendant is facing a mandatory minimum of 5 years and up to 30 years of incarceration.   He is has no stable address or employment, appears to have mental and substance abuse issues and has been hell-bent on causing violence and destruction.   These facts strongly warrant the defendant's pretrial detention.

### III.   Conclusion

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY


By:        /s/ George Eliopoulos
          George Eliopoulos
          D.C. Bar No. 390601
          Assistant United States Attorney
          Violent Crime and Narcotics Trafficking Section
          United States Attorney's Office for D.C.
          555 Fourth Street, N.W., Fourth Floor
          Washington, D.C. 20530
          E-mail: george.p.eliopoulos@usdoj.gov
          Telephone: (202) 252-6957

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel, Joanne Slaight, this 14th day of August, 2020.

_____/s/_____
George Eliopoulos
Assistant United States Attorney