UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 20-CR-183 (RCL) |
| v. | : | |
| CODY TARNER, | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. This memorandum, together with such evidence as may be presented at the sentencing hearing and the Government's allocution at the time of sentencing, is intended to outline to the Court relevant matters relating to what the government believes would be an appropriate sentence in this case. Because of this conviction, the government has reviewed the application of the advisory Sentencing Guidelines, the final Presentence Report ("PSR") prepared by U.S. Probation Officer ("USPO") Ms. Haley Spicer, *see* ECF #84, the relevant factors set forth in 18 U.S.C. § 3553, and the defendant's plea for any impact on the appropriate sentence for the defendant in this matter. Based on that review and consistent with plea agreement, the government has concluded based on the facts of this matter and the defendant's plea dictates that an appropriate sentence for defendant Tarner would be a sentence of 120 months incarceration and a term of supervised release of three years.

**I. INTRODUCTION**

On January 9, 2024, the defendant pled guilty to Count One of the Indictment. Count One charged Arson, in violation of 18 USC § 844(i). The defendant understood that a violation of 18

˜1˜

USC § 844(i) carried a mandatory minimum term of imprisonment of five years and a maximum term of imprisonment of 20 years; a fine of up to $250,000; a term of supervised release of not more than three years; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made. The defendant agreed to pay a $100 special assessment.

In consideration of the defendant's guilty plea, the Government agreed that the defendant will not be further prosecuted for the conduct set forth in the Statement of Offense. After the defendant is sentenced, the Government will request that the Court dismiss the remaining Count of the Indictment in this case at the time of sentencing. Moreover, the defendant agreed and acknowledged that the charge to be dismissed at the time of sentencing was based in fact.

## II.  FACTUAL BACKGROUND

On July 15, 2020, the defendant drove onto the United States Supreme Court's property located at 1 First Street Northeast, Washington D.C., and parking his vehicle in an employee only parking spot. The defendant got out of his car and walked around the Supreme Court property. The defendant then returned to his car and pulled out a red gas can. At approximately 1:48 PM, the defendant was observed on security camera footage pouring gasoline onto three Supreme Court Police unmarked vehicles parked in Supreme Court employee only parking spaces.



0-202-07-15 13-43-00-300 at 13:47:45 elapsed time

While pouring the gasoline on the vehicles, it was observed that some of the gasoline was splashing onto his person and clothing. The unmarked vehicles had emergency police lights visible from the outside of the vehicles, and one of the vehicles had emergency police lights on the roof of the vehicle. The defendant was then seen lighting one of the vehicles on fire resulting in a violent ignition of the gasoline.



0-202-07-15 13-43-00-300 at 13:47:58 elapsed time

This action resulted in the defendant being engulfed in the fire causing severe burns and injuries to himself.



0-202-07-15 13-43-00-300 at 13:47:59 elapsed time

Officer Grable, an officer with the Supreme Court Police Department, was on the First Street sidewalk of the Supreme Court on a fixed security post where she observed smoke and flames and heard a large explosion near the intersection of First Street and Maryland Avenue, Northeast. Officer Grable observed Tarner walking away from the explosion with burns and smoke coming from his clothing. Officer Grable called for assistance and started administering first aid to Tarner. The defendant admits and acknowledges that he caused damage by fire and explosive materials, to vehicles and their contents, that is, a 2016 Ford Interceptor, a 2017 Ford Expedition, and a 2012 Ford Econoline, property of the Supreme Court of the United States Police Department and the United States Federal Government, used in and affecting interstate commerce.

During post arrest interviews, defendant admitted that he was the person that intentionally started the fire with 87 octane unleaded gasoline he had purchased in Pennsylvania for that

purpose. The investigation revealed as further outlined below, *inter alia*, that Tarner had had several encounters with law enforcement in which he has expressed what can be referred to as anti-government and militia extremist ideologies. In fact, Tarner had claimed to be the leader of a particularly identified militia group. Tarner had told multiple local and federal law enforcement agencies that he was the leader of the group and has created an online Facebook group page named after the identified militia group.

### III.   SENTENCING CALCULATION

#### A.   Base Offense Level

Count 1: Arson, 18 USC § 844(i). Base Offense Level: The guideline for 18 USC § 844(i) offenses is found in USSG §2K1.4 of the guidelines. That section provides that an offense that created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or involved the destruction or attempted destruction of a dwelling, an airport, an aircraft, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure facility, or a place of public use; has a base offense level of 24. In this case, the defendant accessed a public space to set multiple law enforcement vehicles on fire using gasoline, thus causing a substantial risk of death or serious bodily injury in an area that is accessible to the public. Accordingly, the applicable guidelines range is a base offense level of 24. USSG §2K1.4(a)(1). *See* PSR ECF #84 ¶¶ 30 & 31.

Because the offense is an offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than 32, increase to level 32. According to USSC § 2332b(g)(5)(A), the term federal crime of terrorism is defined as an offense that – (A) is calculated to influence or affect the conduct of government by

intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of – 844(i) (relating to arson and bombing of property used in interstate commerce). USSG §3A1.4(a). *See* PSR ECF #84 ¶ 33.

Consistent with the plea agreement, the Government agreed that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that the defendant clearly demonstrated acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence. Furthermore, assuming the defendant had accepted responsibility as described in the previous sentence, the Government agreed that an additional 1-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the defendant has assisted authorities by providing timely notice of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

### B.  Sentencing Guideline Calculation

The government concurs with Probation's determination that the defendant's criminal history Category VI, pursuant to U.S.S.G. §  3A1.4(b). *See* PSR ECF #84 ¶ 44.   The government also agrees with Probation's conclusion that based upon a total offense level of 33 and a criminal history category of VI, the guideline imprisonment range is 235 months to 293 months, which is then limited by the statutorily authorized maximum sentence to a range of 235 months to 240 months. *See* PSR ECF #84 ¶ 106.[1]

---

[1] The government initially calculated a lower range of 135 to 168 months in the plea agreement. However, Probation appears correct that the actual range is 235 months to 240 months. Regardless, as agreed upon in our plea agreement, we are requesting a sentence of 120 months incarceration.

### C.  Sentencing Factors

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court shall consider in sentencing defendant Tarner.

**(1)  The nature and circumstances of the offense and the history and characteristics of the defendant**.

**(A)  The nature and circumstances of the offense**

Here, the nature and circumstances of the offense counsel in favor of a significant term of imprisonment – 120 months of incarceration. As outlined above and further highlighted *infra*, the defendant engaged in what was a significant violence act of Arson specifically designed to attack the U.S. Supreme Court property, U.S. government, and he espoused violent anti-government and militia extremist ideologies. Simply put, the defendant is a clear and present danger to others and our governmental institutions, and his criminal actions in this matter demonstrates that the 120-months incarceration sentence is an appropriate sentence in this matter. In fact, the factors listed in 18 U.S.C. § 3553(a) strongly suggest that at a minimum this Court should sentence the defendant to a very lengthy term of incarceration, the government believes that a 120-months sentence of imprisonment is appropriate and sufficient, in the interest of justice, and would punish the defendant appropriately.

**(B)  The history and characteristics of the defendant**

Significantly, the government avers that in reviewing the PSR prepared by USPO Ms. Spicer, she found that the defendant is a 26-year-old man who had no prior convictions. *See* PSR ECF #84 ¶¶41 & 42. More broadly, the government is particularly concerned about the defendant's numerous previous contacts with law enforcement officers at the White House, U.S. Capitol, and other governmental property. For example, after his arrest in this matter, the

˘7˘

investigation revealed that Tarner had had several previous encounters with law enforcement in which he had expressed what reasonably could be referred to as anti-government and militia extremist ideologies. Notably, Tarner had claimed to be the leader of a particularly identified militia group. Tarner had told multiple local and federal law enforcement agencies that he was the leader of the group and had created an online Facebook group page named after the identified militia group. That Facebook page stated in the group's biography that, "[The militia group] is a Stateless NGO That had both Tactical [sic] & Diplomatic Wings & Calls For The Destruction of The Ink Machine of the United States Government."  The "Impressum," or what is commonly known as the "about us" section of the Facebook group page, provides, "We Want to Kill you." The contact information for the Facebook group's email address contained Tarner's name, with his phone number ending in 4094.

In addition, law enforcement confirmed through a close relative of Tarner's that the phone possessed and utilized by Tarner was a cellular phone with the same phone number ending in 4094 and that Tarner utilized the phone to make social media posts. During law enforcement interviews since Tarner's arrest, he admitted that the target phone recovered from his vehicle was the only phone he utilized to make social media posts.

**Defendant Tarner's Previous Contacts With Law Enforcement Officers**

On February 12, 2020, Tarner was stopped by the U.S. Capitol Police on U.S. Capitol grounds, where he was observed taking photographs of official government vehicles and license plates used by U.S. Capitol Police in the protection of members of the United States Congress. During this incident, U.S. Capitol Police interviewed Tarner during which he conveyed pro-militia extremist ideologies with the stated objective of negotiating payment from the U.S.

government. Tarner stated to officers that he was at the Capitol to "negotiate to stop a civil war." Additionally, Tarner told officers that he was at the Capitol to "negotiate to get 80 million dollars" so he would not have to fulfill and collect the bounty Iran placed on the President of the United States. Tarner stated that if he did not receive his payment he would "raid the town" and "hold the area" on Capitol Hill for an hour. Tarner told officers that he knew how to build a nuclear bomb and would do so if his payment was not received.

On February 21, 2020, Tarner posted on his Twitter profile a photo of police officers and stated, "Here's a Picture of some Yankees 12Feb20 looking Incompetent They opened a Federal Investigation into me Mixed Feelings about it, But I suppose it was appropriate for now on their end But I have to retaliate proportionally and make them uncomfortable in this give and take."

On April 17, 2020, law enforcement observed the following post on defendant's militia group's Facebook page:  "Move to MOPP LEVEL 4 Prepare for Mutiny Total Authority must be Challenged All Personnel to Report to Facilities 4 and 7 in The Green zone and make Immediate preparations Yankees have reached Unsurvivable rate and must be administered directly  No Bounty is worth Anarchy Let us take the entire portion unto ourselves instead Assume Protocol 2."

On April 23, 2020, Tarner went to the White House complex and told a United States Secret Service officer that he would like to jump the White House fence, but a few minutes later advised that he had no desire to jump the fence.  On April 24, 2020, the U.S. Secret Service observed several comments on Tarner's social media accounts regarding nuclear weapons and being denied "the bounty."   That same day, U.S. Secret Service officers again encountered

Tarner at Lafayette Park across the White House. Tarner told the officers that the U.S. Secret Service should be worried about the world blowing up. Tarner initially told officers that he was going to set off a thermonuclear device, but later said he would not set off the device and said "you are" when talking to the officers. Tarner stated that he would not set off the device, but hoped the government would set off the device because he wanted the world to blow up.

Tarner also told officers that he came to the area of the White House because he wanted to convince President Trump and the administration that humans were in danger. Tarner claimed to officers that he was the "Emperor of the Metro Area," and currently led his militia group. Tarner continued to explain that he was a nuclear engineer in the U.S. Navy and was discharged because "they" did not agree with his views on educating others on how to manufacture Yellowcake, a reference to uranium concentrate powder. A relative of the defendant had confirmed that the defendant has some kind of nuclear engineering background with the U.S. Navy. Tarner also told the Secret Service officers that he had visited the U.S. Capitol and informed U.S. Capitol Police that he wanted to take over the Capitol and to set off a thermonuclear weapon in Washington, D.C. Tarner told the U.S. Secret Service that he wanted to set off the explosion "to gain notoriety." He went on to say that he hated [former] President Trump and wanted to convince him that "the most dangerous thing to humans is another human." Tarner claimed that he did not personally want to carry out his mission, but that the U.S. Secret Service "would do it themselves."

Later that evening on April 23, 2020, Tarner posted online, "Every Entrance is blocked and unrammable I'll find a signal maker on Foot Go on Gunshots" as well as, "It appears as long as I do not Jump fence they will allow me to remain Come to White House front door to End This Admin."

On April 27, 2020, Tarner posted online, "/32/ I KNOW THAT YOU HEAR ME /32/ The Fact That I am Talking to you RIGHT NOW Should Terrify you I've broken Every law Leaked Nuclear Top Secret Threatened your Capitol Hill On February 12 And Now your White House YET HERE I AM STILL."

On May 23, 2020, a friend of Cody Tarner reported to the Hagerstown, Maryland Police Department that Tarner was espousing violence and that Tarner hoped to terrorize the country with bombs and nuclear weapons.

On July 9, 2020, Tarner was stopped by the Allegheny Township Police Department in Pennsylvania. During the stop, Tarner stated that he knew how to make bombs and that he knew the compounds of bomb making material. The officer reported that Tarner had made vague threats during the stop.

### Tarner's Personal and Family Data and Mental and Emotional Health and Substance Abuse

Additionally, in making its current sentencing recommendation to the Court, the government has also reviewed the defendant's Personal and Family Data as outlined in the PSR which outlined the defendant's relationship with his mother and father, and his other family members. *See* PSR ECF # 84 ¶¶ 49-60. Further, the government has reviewed the defendant's Mental and Emotional Health and Substance Abuse backgrounds as outlined in his PSR. *See* PSR ECF #84 ¶¶ 64-87. As outlined in the PSR, regarding the defendant's mental health in the past, the defendant has had many mental health issues and treatments which led to medical interventions and treatments. *Id*. Nevertheless, at times, the defendant continued to "post violent rants on Facebook, talking about his militia group, and express[ed] antigovernment ideologies" *Id* at ¶ 75.

In making its current recommendation for a 120 months incarceration sentence in this case,

and knowing that the defendant is competent to proceed with this matter, the government has taken into account the defendant's complete mental health history. The government notes that the defendant initially filed a notice of intent to present an insanity defense. ECF No. 47. By his guilty plea, he has abandoned and waved his insanity claim as was his right. *See United States v. Marble*, 940 F.2d 1543 (D.C. Cir. 1991). Accordingly, the government recommendation is significantly lower than the sentencing range outlined in the defendant's PSR. *Id* at ¶ 106.

Consequently, the only consideration for the Court here is to what extent the defendant's mental health history aggravates or mitigates the conduct for which the Court is to impose sentence. The government respectfully avers that based on the defendant's actions and prior contact with law enforcement officers listed *supra*, there are no mitigating factors in this case which would justify a sentence lower than 120 months.

> **(2)   The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

In determining the proper sentence, a sentencing court has discretion to consider the reliability with which relevant facts where established, and to consider how closely related such relevant conduct is to the offense of conviction. *Cf. United States v. Cordoba-Murgas*, 233 F.3d 704, 709 (2d Cir. 2000). Accordingly, the government strongly argues that based on the facts of this matter and the defendant's plea dictates that an appropriate sentence for defendant Tarner would be a sentence of 120 months of incarceration in this matter which will promote respect for the law, provide just punishment, and, most important, deter others who otherwise might engage in similar conduct—which are also important sentencing objectives.

### (3) The sentencing range established by the United States Sentencing Guidelines

The Supreme Court has declared that, in terms of determining an appropriate sentence, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 U.S. 586, 596 (2007). Here, the government believes that be a very lengthy sentence in this matter for incarceration, as outlined *supra*.

### (5) Any pertinent policy statement issued by the USSC

The government is unaware of any pertinent policy statements issued by the USSC.

### (6) The need to avoid unwarranted sentencing disparities among defendants with similar records

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. As discussed above, the defendant should be sentenced to 120 months term of incarceration in this matter, which is an appropriate sentence in this case. Consequently,

based on the facts and evidence in this matter there would be no disparities among other defendants with similar records.

Additionally, "when a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation." This is because the Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice . . . [and thus] reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007); *see also United States v. Gillespie*, 436 F.3d 272, 275 (D.C. Cir. 2006) ("[t]hat a sentence derived from the § 3553(a) factors is identical to a Guidelines sentence should not be surprising").

### III. RESTITUTION

Finally, the government seeks restitution in this case in the amount of $32,371.43, or the fair market value of the damaged and destroyed vehicles, or the replacement costs of the damaged and destroyed vehicles. The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the government has been provided with receipts demonstrating the repairs to the 2017 Ford Expedition damaged by the defendant (see Exhibit 1 - $ 3,233.43) as well as the original cost of the destroyed Sedan Police Interceptor (see Exhibit 2 - $ 29,138.00). The MVRA provides that, if the return of lost property is impossible, the victim is entitled to payment of "the value of the property" on the date of destruction or sentencing, whichever is greater. 18 U.S.C. § 3663A(b)(1)(B).  *See United States v. Bagley*, 907 F.3d 1096, 1099 (8th Cir. 2018), *see also United States v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019).

### IV. CONCLUSION

For the foregoing reasons, the Government respectfully requests that this Court impose a 120-months sentence of incarceration followed by an appropriate amount of supervised release. The government respectfully avers that its recommended sentence to the Court would therefore reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and most importantly, to afford adequate deterrence and to protect the public from further crimes of the defendant.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: _/s/ Emory V. Cole_
EMORY V. COLE
PA Bar No. 49136
Assistant United States Attorney
Federal Major Crimes Section
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7692
JAMES D. PETERSON
Trial Attorney
United States Department of Justice